**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**UNITED STATES OF AMERICA,**
*Plaintiff*,

**v.**

Case No. **18CR10065-001 (Kansas)**
**18CR10154-001 (California)**
**18CR10155-001 (Washington, D.C.)**

**TYLER R. BARRISS,**
*Defendant*.

---

## SENTENCING MEMORANDUM

---

Tyler Rai Barriss respectfully asks this Court to impose a sentence of 20 years (240 months), followed by five years of supervised release. This sentence is the lowest we can recommend that complies with the terms of the plea agreement, which is presented to the Court under Rule 11(c)(1)(C) and calls for a sentencing range from 20 to 25 years.[1]

Here, Mr. Barriss presents the Court with reasons to impose the lowest sentence under the plea agreement, as follows:

- He has demonstrated extraordinary acceptance of responsibility for his conduct and expressed sincere remorse to the Finch family, Wichita Police, and Sedgwick County emergency services;

- His efforts to resolve three federal cases, and all known charges against him, saved the government and courts tremendous time and resources;

[1] Doc. 53 at ¶ 3(a).

- The sentencing range in the plea agreement is for a term of imprisonment far *above* the advisory sentencing guidelines;
- He never intended for anyone to get hurt and his conduct was an outgrowth of the culture within the gaming community; and
- He had no guidance, no structure, no education, and no employment – video games became his identity and gaining notoriety as a swatter filled a large void.

Although he asks this Court to impose the lowest sentence within the range under the plea agreement, Mr. Barriss also acknowledges that this case presents the Court with a set of facts and circumstances that are tragic, deplorable, and deadly. Mr. Barriss never intended or desired any harm to Mr. Finch. In arguing for a sentence here, he does not diminish or seek to retract his role in the events that resulted in Mr. Finch's tragic death.

## I. Mr. Barriss has demonstrated extraordinary acceptance of responsibility.

### A. Mr. Barriss issued letters of apology that expressed sincere remorse to victims.

It is common that a criminal defendant in federal court who enters a plea of guilty routinely meets the burden to demonstrate he deserves a sentence reduction for acceptance of responsibility.[2] However, there are rare cases where a criminal defendant goes beyond simply admitting culpability and making a timely confession

[2] U.S. Sentencing Guideline § 3E1.1; *see also United States v. Lloyd,* 13 F.3d 1450, 1453–54 (10th Cir. 1994) ("The defendant bears the burden of proving acceptance of responsibility.").

such that the Court can consider the acceptance of responsibility to be extraordinary and beyond that contemplated by the acceptance guideline.[3] This is such a case.[4]

Long before he will appear at sentencing, Mr. Barriss expressed sincere remorse to the primary victim of his conduct – the family of Andrew Finch. As a term of his plea agreement,[5] Mr. Barriss agreed to write letters of apology to the Finch Family, Wichita Police Department, and the Sedgwick County Emergency Communications. The letters[6] were delivered to the government on December 20, 2018, and were "an expression of [Mr. Barriss's] true and sincere thoughts, feelings and beliefs."[7]

In the letter to the Finch Family, Mr. Barriss said, "[e]veryday I think about how my actions led to his death." He asked for forgiveness and expressed his "hope that my sentence may in some way help you feel better that justice is done."[8]

---

[3] *See, e.g.*, *United States v. Benally*, 215 F.3d 1068, 1078 (10th Cir. 2000) ("The government asserts it was incumbent on the sentencing court to explain why Mr. Benally's admission of culpability and timely confession were so extraordinary that they went beyond the cooperation and assistance contemplated by the acceptance of responsibility guideline at U.S.S.G. § 3E1.1(b). We agree.").

[4] The parties and the PSR writer all agree that a reduction for acceptance of responsibility is appropriate in this case. *See* Doc 63 (PSR) at ¶¶ 117 – 123.

[5] Doc. 53 at ¶ 6.

[6] Def. Exs. 100, 101, 102.

[7] Doc. 53 at ¶6. The government may argue they are "underwhelmed" by the content of the letters. But the letters are in Mr. Barriss's hand and reflect the thoughts and communicative style of a young man with very little education and no skill in letter writing of such content.

[8] Def. Ex. 101; PSR at ¶ 122.

But this was not the first time he apologized to the Finch family. When he was held in state custody at the Sedgwick County Detention Center, Mr. Barriss exchanged letters with Jerome Finch, Andrew Finch's brother. Jerome Finch described the letter exchange as a way to "begin the process of healing."[9] In a letter to Jerome Finch, that was written and sent long before the plea agreement, Mr. Barriss said that he felt "a level of guilt for what happened to your brother."[10]

Even before the letters, Mr. Barriss made public comments expressing his remorse. As documented in the PSR, on January 12, 2018 – again, long before he was federally charged and entered into a plea agreement – Mr. Barriss was interviewed by KWCH News in Wichita. He said to the reporter, "I'll take responsibility and serve whatever time, or whatever it is that they throw at me…I'm willing to do it."[11] Regarding swatting, he said, "I hope no one ever does it, ever again. I hope it's something that ceases to exist."[12]

In addition to the Finch Family, Mr. Barriss also apologized to law enforcement and emergency services in Wichita. He was candid in his letter to the Wichita Police Department when he wrote, "In the past I did not fully respect how the police protect

---

[9] Brenden Koerner, *It Started as an Online Gaming Prank. Then it Turned Deadly*. WIRED MAGAZINE (Oct. 23, 2018), *available at* https://www.wired.com/story/swatting-deadly-online-gaming-prank/.

[10] *Id.*

[11] PSR at ¶ 119.

[12] *Id.*

the community and I took advantage of them in my misconduct. … I hope others will also learn from my mistakes so they won't do the same thing. I am sorry."[13] To Sedgwick County Emergency Communications, he wrote, "I wish this would have never happened. I have learned from my mistakes and hope others will learn from them too and not repeat them. I am sorry."[14]

It may be commonplace for defendants to express remorse for victims during allocution, but it is not common for a defendant to apologize, in writing and during interviews, prior to the sentencing hearing. That is the first, but not only, reason that Mr. Barriss's acceptance of responsibility has been extraordinary.

**B. Resolving three cases in one saved the judiciary and the government from expending a tremendous amount of resources.**

The second way Mr. Barriss's acceptance of responsibility has been extraordinary is the way he aggressively pursued a "global" plea deal to capture all of his crimes, from all districts, into one federal case.[15] From the onset of his federal case in the District of Kansas, Mr. Barriss authorized his counsel to pursue negotiations with prosecutors throughout the United States with the goal to enter into a global deal.

As the Court is aware, and as it was presented at the change of plea hearing, the plea agreement here attempted to clear the deck of all charges by resolving three

---

[13] Def. Ex. 101; PSR at ¶ 122.

[14] Def. Ex. 102; PSR at ¶ 122.

[15] *See, e.g.*, Fed. R. Crim. P. 20.

federal cases in one in fell swoop. This resolution is not only mutually beneficial to both Mr. Barriss and the government, it also saves scarce judicial resources[16] and furthers legitimate societal interests.[17]

### *B.1. Utilizing the broad jurisdiction of the Central District of California, Mr. Barriss essentially wrote his own charges so he could plead guilty to them.*

Saying that this global plea deal resolved three cases in one is also a misnomer. The Central District of California had jurisdiction to charge every swatting or hoax call incident because Mr. Barriss was in that district when he made those calls. Recognizing this sweeping jurisdictional opportunity, Mr. Barriss leveraged the negotiation process to accept responsibility in the California case for his crimes that also touched at least 24 other federal districts[18] and one foreign country.[19]

---

[16] *United States v. Haggerty*, 731 F.3d 1094, 1101 (10th Cir. 2013) ("the Supreme Court recognizes the government's 'legitimate interest in encouraging the entry of guilty pleas and in facilitating plea bargaining,' which is 'a process mutually beneficial to both the defendant and the [Government].' It further recognizes the courts' interest in saving scarce judicial resources.") (citations omitted).

[17] USSG § 3E1.1, app. note 6.

[18] The following federal districts would have also had jurisdiction to charge the incidents captured in the California case, 18-10154-EFM: Southern District of Ohio; District of New Hampshire; District of Nevada; District of Massachusetts; Northern District of Illinois; District of Utah; Eastern District of Virginia; Southern District of Texas; District of Arizona; Northern District of Texas; Eastern District of Missouri; Western District of Missouri; Southern District of Illinois; District of West Virginia; District of Maine; Eastern District of Pennsylvania; District of New Mexico; Southern District of New York; Northern District of Indiana; Northern District of Florida; Eastern District of Michigan; District of Connecticut; Eastern District of New York; Southern District of Indiana.

[19] Calgary, Alberta, Canada (18-10154-EFM, Count 45).

But Mr. Barriss did not just accept responsibility for the crimes he was charged with by California – he essentially wrote 16 of the charges. As the parties worked harmoniously to reach a global plea deal, prosecutors from the Central District of California drafted charges to file as part of the negotiations. Presented with the opportunity to review the charges before they were filed, Mr. Barriss authorized his counsel to disclose additional charges to the government – complete with dates, locations, and statutory citations.[20]

***B.2. Following the change of plea hearing, Mr. Barriss disclosed to the prosecutors in the Northern District of Texas information relating to a swatting incident that was not charged in the California case.***

As the Court may recall during the change of plea hearing, the parties learned that our good faith efforts to capture all known swatting and hoax call incidents in the global plea deal had failed. Days prior to the hearing, a prosecutor from the Northern District of Texas contacted the prosecutors here about another alleged swatting incident they believed may have involved Mr. Barriss. The parties elected to continue forward under the plea deal.

Subsequent to the change of plea hearing, and with no assurance or promises extended that he would in any way benefit from doing so, Mr. Barriss authorized his counsel to cooperate fully with the authorities in the Northern District of Texas concerning this incident. Since then, we returned a letter[21] that confirmed Mr.

---

[20] Def. Ex. 103.

[21] Def. Ex. 104.

Barriss was involved in that incident, agreed the government can argue it is relevant conduct in this case,[22] and even disclosed all that we knew about the facts and circumstances of the crime.

From the way he has expressed remorse, hustled to a negotiate a global plea deal, drafted many his own charges, and confessed to offenses he has not even been charged with committing, Mr. Barriss has demonstrated extraordinary acceptance of responsibility. These facts alone merit the Court's consideration to impose the least term of imprisonment under the plea agreement.

## II. The Sentencing Guidelines call for a term of imprisonment that is almost seven years below the shortest sentence authorized by the plea agreement.

We do not ask for a downward departure or a variance. Here, if the Court accepts the plea agreement and imposes a sentence within the range negotiated by the parties, the Court must depart *upward* from the Sentencing Guidelines.

The PSR final guideline calculations were as follows:

| | | |
|---|---|---|
| Kansas | TOL 19 / CH Cat IV | 46-57 months |
| California | TOL 20 / CH Cat IV | 51-63 months |
| Washington DC | TOL 15 / CH Cat IV | 30-37 months |

If the Court stacks the three cases to impose consecutive sentences for all three, the sentencing range is 127 to 157 months. If the Court were to impose consecutive sentences at the high end of the stacked guideline range, it would result

[22] USSG § 1B1.3.

in sentence of 157 months, which is 83 months ***below*** the lowest sentence under the plea agreement (240 months).

The tentative guideline calculations were known by the parties and were part of the negotiations of a global plea deal. Put differently, Mr. Barriss agreed to the global deal knowing that his advisory guideline range would come out below the sentencing range in his binding plea agreement. He did so because he recognized the severity of his conduct and the tragic death that resulted from it.[23] He also recognized that his cases do not present the Court with facts that fit squarely within the guidelines because there are few, if any, comparable cases from any district that match the facts and circumstances here.[24]

This case thus presents the Court with the discretion to decide not whether it will depart upward but by how much. We ask the Court to impose a sentence that is sufficient but not greater than necessary under the sentencing factors present here – 240 months.

## III. The notoriety of being a known swatter within the gaming community became an intoxicant to Mr. Barriss and it incrementally desensitized him to real world consequences.

[23] The PSR notes the potential grounds for an upward departure. *See* PSR at ¶ 585-586.

[24] *Cf. Gall v. United States*, 552 U.S. 38, 46 (2007) ("For even though the Guidelines are advisory rather than mandatory, they are, as we pointed out in *Rita,* the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions.").

Mr. Barriss did not intend to kill Mr. Finch. He did not know him or have any connection to him or communication with him; he was two time zones distance from him. He also did not intend to harm him. As he said after the offense, "I never intended for anyone to get shot and killed."[25]

Although Mr. Barriss purposefully made phone calls with the intent to elicit a response from Wichita emergency services (and others, on other dates and other locations), his intended "target" was Mr. Gaskill, not Mr. Finch. He meant only to harass and scare Mr. Gaskill, not harm him. In the end, it was a tragic mistake.

### A. Swatting is prevalent in the gaming community as a way to harass and bully others online.

Some context of "swatting," generally, is important to understanding how and why this happened and the nature and circumstances of the offense.[26] "Swatting" is the term commonly used for several of the crimes here,[27] where other crimes are referred to as "hoax calls," or calls meant to evacuate facilities due to threats of bombs being present.[28]

---

[25] PSR at ¶ 119.

[26] 18 U.S.C. §3553(a)(1).

[27] Threats to Injure in Interstate Commerce, 18 U.S.C. § 875(c).

[28] Conveying False Information Concerning the Use of an Explosive Device, 18 U.S.C. § 844(e).

Swatting was recognized by the Federal Bureau of Investigation as an emerging threat as early as 2008.[29] The FBI described it as "calling 9-1-1 and faking an emergency that draws a response from law enforcement – usually a SWAT team."[30] In recent years, it has unfortunately become more commonplace in one community in particular – the gaming community.[31]

For example, one gamer named "Ice Poseidon" became an "I.R.L." (in real life) streamer, which means that he broadcast his daily life to "thousands of obsessed viewers."[32] He had previously live-streamed his video game playing. To his community of fans, swatting was so prevalent that once he started IRL streaming, "he was swatted every day for a month."[33] As the reporter covering his story wrote, "[s]watting has exploded in popularity in recent years, owing in part to the rise of live streaming." [34]

---

[29] *See* FBI Bulletin, *Don't Make the Call: The New Phenomenon of "Swatting"* (Feb. 2008), *available at* https://archives.fbi.gov/archives/news/stories/2008/february/swatting020408.

[30] *Id.*

[31] By "gaming community," we mean the global community of persons who play video games with and against each other over the internet.

[32] Adrian Chen, *Annals of Technology: Ice Poseidon's Lucrative, Stressful Life as a Live Streamer*, THE NEW YORKER (July 9, 16, 2018), *available at* https://www.newyorker.com/magazine/2018/07/09/ice-poseidons-lucrative-stressful-life-as-a-live-streamer.

[33] *Id.*

[34] *Id.*

There have been a number of news stories in recent years documenting the rise in swatting incidents in the gaming community as a way for gamers to harass or bully other players.[35] Ms. Coley, a gamer and one of Mr. Barriss's close and only friends, said, "[s]watting has been prevalent in the gaming community since I started online gaming and has become a 'practical joke' to some to play on other gamers."[36]

In this case, the quarrel between co-defendants, Mr. Gaskill and Mr. Viner, hatched when Mr. Viner "became upset by events that occurred during the game," Call of Duty World War II, "that he blamed on defendant Gaskill."[37] Mr. Barriss had no role in the quarrel itself. Nor, for that matter, did Mr. Finch, who had no knowledge of any quarrel or affiliation with any of the parties. But Mr. Barriss had a reputation as a known swatter, a reputation he built to fill a large void in his life.

**B. The absence of structure and support left a tremendous void in his life that Mr. Barriss filled with online notoriety.**

Mr. Barriss was part of the gaming community. Without it, he had no other community. He had no true family, guidance, education, or prospects.[38]

---

[35] *See, e.g.*, Nick Wingfield, *Online "Swatting" Becomes a Hazard for Video Gamers and Police Responders*, THE NEW YORK TIMES (Mar. 20, 2015), available at https://www.nytimes.com/2015/03/21/technology/online-swatting-becomes-a-hazard-for-popular-video-gamers-and-police-responders.html; *Gamers use police hoax to "Swat" opponents*, USA TODAY (Sept 15, 2014), *available at* https://www.usatoday.com/story/tech/2014/09/15/gamers-swatting-hoax/15653577/.

[36] Def. Ex. 106.

[37] *See* Superseding Indictment (Doc. 32) at 2-3.

[38] 18 U.S.C. § 3553(a)(1).

As a young man, he spent almost all of his time indoors playing video games. His only family was his grandmother, Wendy Gregory. His father died when he was very young[39] and his mother was absent, fleeing her son for a life of prostitution, drugs, and crime.[40]

Mr. Barriss was home schooled until he quit school altogether.[41] When he was home schooled, he was left to do the work on his own.[42] Ms. Gregory would merely pick up assignments and then leave it to a youthful teenager to figure out on his own. Ms. Milan knew Mr. Barriss during this time and observed that he "did all the work on his own. She (Ms. Gregory) did not help him."[43]

Mr. Barriss has also never had a job. [44] At the time of his arrest, Mr. Barriss was living in a homeless shelter in Los Angeles. [45] With no guidance, no structure, school, or employment, Mr. Barriss had video games. The game Halo became his salve to social acceptance in a virtual world.

---

[39] PSR at ¶ 454.

[40] *Id.* at ¶¶ 454-458.

[41] PSR at ¶ 491.

[42] Def. Exs. 106, 107.

[43] Def. Ex. 107.

[44] PSR at ¶ 471; Def Ex. 105.

[45] PSR at ¶ 498.

Using his X-Box for online gaming, he gained notoriety as premier Halo player. As his friend, Ms. Coley, said, "he became sort-of famous in the gaming community for being one of the very best Halo players, and he took pride in that. This was the only time I've seen him focused, excited, and really to do anything since I had met him."[46] Ms. Milan said, "Since he was not socialized at all I feel he turned to the internet and gaming as his only means of connecting."[47]

Everyone who knows him concluded that Mr. Barriss turned to swatting to fill the void that was left by the lack of any other structure in his life. Ms. Gregory said that, "she believes the defendant committed the instant offenses for power, admiration and out of frustration."[48]

Ms. Coley said, "I do not believe Tyler meant to hurt anyone. … He really felt like he was god-like, due to the notoriety he received from the gaming community, not only for his gaming but also, swatting."[49]

Ms. Milan described when she took a young Mr. Barriss and her daughter, Ms. Coley, roller skating and she had "to take them home early because being around that many people was too much from Tyler to handle at that time."[50] She reached the same

---

[46] Def. Ex. 106.

[47] Def. Ex. 107.

[48] PSR at ¶ 465.

[49] Def. Ex. 106.

[50] Def. Ex. 107.

conclusion about why he turned to swatting. She said, "[s]ince he was not socialized at all I fell he turned to the internet and gaming as his only means of connecting."

Mr. Barriss himself confessed to a reporter that he started swatting as a "need to feel important," and that he "became addicted" to "prove that I was the real deal."[51] His own self-observation revealed that he recognized that he turned to swatting to fill the void and eventually became completely desensitized to the real world consequences of his conduct.

**C. Mr. Barriss now understands the consequences of his actions and the requested sentence is sufficient but not greater than necessary to achieve retribution, incapacitation, and deterrence.**

A core tenant of swatting is that it provides the ability to bully and harass while remaining completely anonymous. It is borne from rules and a culture of a new frontier.[52] Mr. Barriss had no worldly identity while living alone in his bedroom.[53] He

---

[51] PSR at ¶ 465.

[52] As described by physician and writer Oliver Sacks, "I am confronted every day with the complete disappearance of the old civilities. Social life, street life, and attention to people and things around one have largely disappeared, at least in big cities, where a majority of the population is now glued almost without pause to phones or other devices – jabbering, texting, playing games, turning more and more to virtual reality of every sort. Oliver Sacks, *Personal Story: The Machine Stops, The neurologist on steam engine, smartphones, and fear of the future*, THE NEW YORKER (Feb. 11, 2019) at 28.

[53] "Ms. Gregory stated that after the defendant dropped out of school he did nothing other than stay in his room. Ms. Gregory reported that for approximately six months she did not see the defendant as he stayed in his room which had an attached bathroom." PSR at ¶ 463.

gained notoriety in gaming, and then in swatting. He falsely felt his own identity tied to it and failed to appreciate the real world consequences for his action.

As detailed above, Mr. Barriss said repeatedly that he never intended for anyone to get hurt. His belief, however irrational, was buttressed by the fact that he had made so many swatting calls prior to December 28, 2017 and no one had gotten hurt during any of those incidents.

But now, as he stands to be sentenced by the Court, Mr. Barriss is no longer oblivious to the real world consequences of his past conduct. An innocent man was killed. He has repeatedly said that he has learned from his mistakes. He has no choice. Every day he is reminded and must run head-first into the real world consequences for his actions.

The name "Tyler Barriss" is now infamous and synonymous with consequences. He is going to prison for a very long time.[54] By the time he is released from the Bureau of Prisons, technology will have changed so drastically that the entire concept and culture of swatting will also have changed.

He is also the example the government can and will use to achieve deterrence, to the gaming community and beyond.[55] Just last month, an international publication declared, "[a]nyone tempted to cry wolf might ponder the fate of Tyler Barriss."[56]

---

[54] 18 U.S.C. § 3553(a)(2)(A),(C).
[55] 18 U.S.C. § 3553(a)(2)(B).

[56] *Swatting could become a federal crime*, THE ECONOMIST (Jan. 12, 2019), *available at* https://www.economist.com/united-states/2019/01/12/swatting-could-become-a-federal-crime.

The sentence we request – 20 years – is "sufficient, but not greater than necessary" to accomplish the purposes of sentencing set forth by Congress.[57] It is also the appropriate sentence for the facts and circumstances of this case and for the individual, Tyler Barriss, who must serve it.

## IV. Conclusion

For the reasons above, Mr. Barriss asks the Court to impose the lowest sentence under the bargain he struck with the government. We ask this Court to impose a sentence of 20 years (240 months) imprisonment and for 5 years of supervised release.

Respectfully submitted,

s/ Rich Federico
Rich Federico, #22111
Assistant Federal Public Defender
117 SW 6th Avenue, Suite 200
Topeka, Kansas 66603-3840
Phone: 785-232-9828
Fax: 785-232-9886
Email:rich_federico@fd.org

[57] 18 U.S.C. § 3553(a); *Tapia v. United States*, 564 U.S. 319, 325 (2011) ("These four considerations—retribution, deterrence, incapacitation, and rehabilitation—are the four purposes of sentencing generally … .").

**CERTIFICATE OF SERVICE**

I hereby certify that on February 22, 2019, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to all interested parties.

s/ Rich Federico
Rich Federico, #22111